UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NETJETS ASSOCIATION OF
SHARED AIRCRAFT PILOTS,

       Plaintiff,

                             Case No. 2:23-cv-1404
   v.                       JUDGE EDMUND A. SARGUS, JR.
                             Magistrate Judge Kimberly A. Jolson

NETJETS AVIATION, INC., and
NETJETS INC.,

       Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff NetJets Association of Shared Aircraft Pilots' ("the Union" or "Plaintiff") Motion for Preliminary Injunctive Relief (Pl. Mot., ECF No. 32) and the Union's Motion for Leave to File Second Amended Complaint (Mot. for Leave, ECF No. 44). For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Leave, **DENIES** Plaintiff's Motion for Preliminary Injunctive Relief, and **DISMISSES** the case for lack of subject matter jurisdiction.

## BACKGROUND

This case arises from allegedly unlawful actions taken by Defendants NetJets Aviation, Inc. and NetJets Inc.'s (together, "the Company" or "Defendants") amidst interim collective bargaining between the Company and the Union.

### I.    Factual Background

The Company offers private jet charter services. (Second Am. Compl., ECF No. 44-2, at PageID # 4441–42.) The Union is the exclusive bargaining representative for the pilots who fly the Company's private jets. (*Id.* at PageID # 4441.) The customers who use the Company's

1

services receive fractional ownership of its aircraft fleet, while the Company's pilots and crew man the aircraft.  (*Id.* at PageID # 4441–42.)  The Parties refer to those customers as "Owners." (*Id.*)

The Parties entered into a collective bargaining agreement in 2020.  (*Id.* at PageID # 4442.) Although the current collective bargaining agreement does not expire until 2029, the Parties chose to engage in interim collective bargaining.  (*Id.*)

### A.    The Website

At the center of this dispute is the pilot's ability to refer Owners to a Union-operated website.   That publicly-accessible website—GenuineQs.com—contains information about the Union's bargaining position (the "Website").  (Second Am. Compl., ECF No. 44-2, at PageID # 4442–43*.*)  According to the Union, the Website is "patently intended to win public support in the labor dispute and bring attention to subjects of bargaining and related issues."  (*Id.*)  The Union has used the Website since at least 2014, and its substance has not substantially changed since that time.  (*Id.* at PageID # 4443.)  The Union has encouraged pilots to refer Owners to the Website since 2014, including during the ongoing midterm bargaining.  (*Id.* at PageID # 4443–44.)  The Company now seeks to prevent pilots from referring Owners to the Website.  (*Id.*)

The Union alleges that three emails sent by Company leadership about the Website—as well as an alleged incident leading to a defamation lawsuit—constitute violations of the Railway Labor Act.

### B.    The Chief Operating Officer's March 8, 2023 Email to Pilots

Upon learning that pilots were referring Owners to the Website, the Company's Chief Operating Officer, Alan Bobo, emailed all pilots the following message:

> Crewmembers,
>
> It's been brought to our attention that some Pilots may be referring Owners to a union-sponsored website.

> Please be advised that this is against Company policy and violates Section 3 of the Crew Policy Manual – Professional Image and Communications.
>
> We appreciate your continued professionalism and focus on Safety and Service.
>
> Alan Bobo
> COO

(Second Am. Compl. Ex. D, ECF No. 44-6, at PageID # 6086.) The Crew Policy Manual's Section 3 governs pilots' interactions with Owners. (Second Am. Compl. Ex. E, ECF No. 44-7, at PageID # 6087–88.) In relevant part, Section 3 prohibits discussing controversial topics, making negative comments about the Company, or discussing any matter that could be misinterpreted or cast doubt on the safety of flight operations. (*Id.*) The Union alleges that Mr. Bobo's email implies that referring Owners to the Website would subject pilots to discipline, including termination. (Second Am. Compl., ECF No. 44-2, at PageID # 4445.)

### C. The President of Sales, Marketing and Service's April 19, 2023 Email to Non-Pilots

The Union also rests its claims on an email Pat Gallagher—the Company's President of Sales, Marketing and Service—sent on the same day that pilots engaged in picketing. (*Id.* at PageID # 4446.) Mr. Gallagher's email was sent only to non-Union managers and staff, and not to the pilot group. (Def. Mot., ECF No. 18-1, at PageID # 3377.) Mr. Gallagher's email discussed, at length, the Union's negotiating tactics. (Second Am. Compl., ECF No. 44-2 at PageID # 4446.) Mr. Gallagher described the Union as "run[ning] its playbook." (*Id.*) Mr. Gallagher stated that the Union's next "step in the playbook" would involve assertions that NetJets is putting safety at risk, and he anticipated that the Company's leadership team would be personally attacked. (*Id.*) Mr. Gallagher described the Union's activities as "unfortunate distraction[s]," "disheartening," and "damaging to [the Company's] brand." (*Id.*) He stated that the Union's rhetoric throughout bargaining was unrepresentative of how most pilots felt about the Company. (*Id.*)

### D. The Chief Executive Officer's August 11, 2023 Email to Pilots

On August 11, 2023—months after the Union filed its Amended Complaint and the Parties briefed the Company's Motion for Judgment on the Pleadings—the Company's CEO sent an email to all pilots. (ECF No. 32-1, at PageID # 4185–87.) The CEO stated that the Company intends to reach an interim bargaining agreement with the Union to increase pilot compensation and provide other enhancements, but that the Union was impeding those efforts by "defaming the Company and its Leadership team instead of negotiating a reasonable agreement." (*Id.* at PageID # 4185.) He stated that the Union "continues to spend [the pilots'] union dues putting out advertisements and press releases falsely attacking, among other things, the quality of [the Company's] new-hire Pilots and the safety of the Company's training programs." (*Id.*) The CEO called the Union's attacks on the Company "knowingly false," "disrespectful," and "unnecessary." (*Id.*)

The CEO then discussed, in detail, the Union's hiring of a mobile billboard truck for advertising. (*Id.* at PageID # 4186–87.) The Union hired a mobile billboard truck to display the names and faces of the Company's leaders, drive around the neighborhoods where the leaders live, and park in front of their homes. (*Id.*) The CEO described this as an unacceptable attempt to scare and intimidate the Company's leaders' families. (*Id.*) The CEO then stated that, "[d]espite all of this, the Company remains willing to negotiate amendments" to the collective bargaining agreement because the negotiations have "never been about [the Union] and their playbook." (*Id.*) The CEO expressed a desire to resume voluntary negotiations and requested that the Union engage in bargaining by providing reasonable written proposals. (*Id.* at PageID # 4187.)

### E. The Baseball Incident and Defamation Lawsuit

The Parties disagree about an alleged incident involving a baseball being thrown at the Union's hired mobile billboard truck.

4

The Union alleges that on September 6, 2023, Mr. Bobo threw a baseball at one of the mobile billboard trucks mentioned in the CEO's email. (Pl. Mot., ECF No. 32-1, at PageID # 4188, 4197, 4202.) Between 4:30pm and 5:00pm on September 6, 2023, the mobile billboard truck driver was driving around the neighborhood where Mr. Bobo lives. (ONeal Decl., ECF No. 32-2, at PageID # 4208–09.) The driver witnessed a white man say something while holding a baseball in his hand. (*Id.*) The man appeared to be in his 40s or 50s with light brown hair, six feet tall, and wearing a white shirt and khaki or light-colored pants. (*Id.* at PageID # 4209.) The man then threw the baseball at the mobile billboard truck. (*Id.* at PageID # 4208.) After the driver left the area, she called her supervisor and described the pitcher. (*Id.* at PageID # 4209.) The supervisor showed the driver a photo of Mr. Bobo, and the driver stated she was "100 percent certain that Mr. Bobo was the individual who [she] saw throw the baseball." (*Id.*) The driver then called the police to report the incident at 5:12pm, but she did not name Mr. Bobo during the incident report interview. (*Id.* at PageID # 4209–10, 4216.) The address she provided in the police report as the location near where this occurred matched Mr. Bobo's address. (*Id.*; Pl. Reply, ECF No. 43, at PageID # 4379.)

The Union sought to inform its members of the incident. It contacted the Company's general counsel, who stated that Mr. Bobo did not throw a baseball at the billboard truck and told the Union to advise anyone "spreading that falsehood . . . to cease immediately." (*Id.* at PageID # 4378.) The Union then published a communication to its membership on the evening of the day the baseball incident occurred. (Pl. Reply, ECF No. 43, at PageID # 4379.) The Union stated:

> [A]n individual resembling NetJets Chief Operating Officer Alan Bobo emerged from the Bobo residence and threw a baseball at the mobile digital billboard truck retained by [the Union] to drive in the vicinity of Bobo and Chief Pilot Don Wittke's neighborhood.

(*Id.*) After receiving the police report a few days later, the Union sent another communication to its members, stating in relevant part:

> *Report states that incident occurred at the home address of NetJets COO*
>
> . . .
>
> NJASAP has redacted the exact address of the incident to protect sensitive information, but can confirm the address specified in the "location of occurrence" section of the report is that of NetJets Chief Operating Officer Alan Bobo. As previously stated in a communication that can be referenced here, an individual was observed throwing a baseball at the truck display and damaging it. Officers continue their investigation into the matter.

(*Id.* at PageID # 4380.) Counsel for the Union then contacted counsel for the Company, stating it had heard Mr. Bobo had evidence proving he did not throw the baseball. (*Id.* at PageID # 4381.) The Union states its counsel received no response. (*Id.*)

The Company vehemently denies that Mr. Bobo threw a baseball at the mobile billboard truck. Mr. Bobo states that he has an alibi, claiming that he was nowhere near his house during the time of the alleged incident. (Bobo Decl., ECF No. 36-1, at PageID # 4276–80.) In support of Mr. Bobo's alibi, the Company submitted evidence showing Mr. Bobo left the NetJets facility around 4:53pm and arrived at his coworkers' house—which is down the street from his own residence—at 5:23pm, after the alleged baseball incident had already occurred and been reported to the police. (VanderStoep Decl., ECF No. 36-9, at PageID # 4329–33, 4337–41; Wittke Decl., ECF No. 36-15, at PageID # 4347–48; Ex. to Wittke Decl., ECF No. 36-16, at PageID # 4350–51.) The evidence provided by the Company shows Mr. Bobo's attire did not match the description given by the mobile billboard truck driver. (VanderStoep Decl., ECF No. 36-9, at PageID # 4331, 4337–41.) Mr. Bobo claims to have driven towards his gym after dropping his coworker off, arriving at the gym at approximately 5:40pm. (Bobo Decl., ECF No. 36-1, at PageID # 4278.)

6

Mr. Bobo also provides still images from his neighbor's security footage on the day of the incident.  The images show the mobile billboard truck driving by Mr. Bobo's residence at approximately 4:40pm.  (Bobo Decl. Ex. 3, ECF No 36-4, at PageID # 4288–96.)  There are no people in the images.  (*See id.*)

Mr. Bobo filed a defamation action against the Union in the Delaware County Court of Common Pleas for the Union's allegations surrounding the baseball incident, one day after the Union filed its Motion for a Preliminary Injunction.  (Bobo Decl., ECF No. 36-1, at PageID # 4279–80; Ex. 4 to Bobo Decl., ECF No. 36-5, at PageID # 4298–307.)  The Union has denied Mr. Bobo's defamation allegations.  (Pl. Reply, ECF No. 43, at PageID # 4377.)  The state court litigation is ongoing.

## II.    Procedural Background

The Union alleges that these facts constitute violations of Section 2, Third of the Railway Labor Act, 45 U.S.C. § 152, Third, and Section 2, Fourth of the Railway Labor Act, 45 U.S.C. § 152, Fourth (hereafter, "§ 2, Third and Fourth").  Specifically, the Union argues that the emails, the baseball incident, and the defamation lawsuit demonstrate anti-union animus or strike a fundamental blow to the Union, warranting intervention by this Court.  After briefing the Company's Motion for Judgment on the Pleadings regarding the Union's Amended Complaint (ECF Nos. 18, 23, 26), the Union filed a motion for Preliminary Injunction (Pl. Mot., ECF No. 32-1).  The Preliminary Injunction Motion is ripe for this Court's review.[1]  The Parties jointly moved

---

[1] Because the Company's Motion for Judgment on the Pleadings was ripe at the time of the Union's Motion for a Preliminary Injunction, the Company often cites and relies upon its prior Motion for Judgment on the Pleadings briefing. (*See, e.g.*, Def. Resp., ECF No. 36, at PageID # 4255–56.)  Accordingly, the Court will consider arguments made in the Parties' briefing on the prior Motion for Judgment on the Pleadings in ruling on the pending Motion for Preliminary Injunction.

to vacate the Preliminary Injunction Hearing and requested that the Court issue its ruling based on the pleadings, briefs, declarations, and other materials submitted by the Parties. (Jt. Mot., ECF No. 48.) The Court granted the Parties' Joint Motion and agreed to rule on the Preliminary Injunction based on the written record. (ECF No. 49.)

The Union filed a Motion for Leave to file a Second Amended Complaint. (Mot. for Leave, ECF No. 44.) The Union's Motion for Leave is also ripe for this Court's review. (ECF Nos. 46, 50.)

<b>STANDARD OF REVIEW</b>

**I.     Leave to Amend**

Fed. R. Civ. P. 15(a)(2) states that a "court should freely give leave [to amend] when justice so requires." This rule gives the district court discretion in deciding whether to permit an amendment. *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 551 (6th Cir. 2008). Reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Creech v. Emerson Climate Techs., Inc.*, No. 3:15-CV-14, 2015 WL 6551856, at *2 (S.D. Ohio Oct. 29, 2015) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Delay alone is "not a sufficient reason for denying leave[.]" *Denoewer v. Union Cty. Indus.*, No. 2:17-CV-660, 2020 WL 1244194, at *13 (S.D. Ohio Mar. 16, 2020) (citing *Tefft v. Seward*, 689 F.2d 637, 640 (6th Cir. 1982)). Instead, "the delay 'must have resulted in prejudice to the party opposing the motion.'" *Id*. (citing *Tefft*, 689 F.2d at 640).

When a party requests leave to amend after the deadline set by a court's scheduling order, the party must show good cause pursuant to Fed. R. Civ. P. 16. *Id*. (citing *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003)). In considering whether good cause exists, courts look to: "(1)

8

the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) the potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure the prejudice." *York v. Lucas Cty*., Ohio, No. 3:13 CV 1335, 2015 WL 2384096, at *2 (N.D. Ohio May 19, 2015).

## II. Preliminary Injunction and Subject Matter Jurisdiction

The Parties raise the threshold issue of subject matter jurisdiction while arguing about the likelihood of success in their briefing on the Union's preliminary injunction motion. Although the Parties do not characterize the arguments as pertaining to subject matter jurisdiction, courts— including the Sixth Circuit—considering § 2, Third and Fourth claims under the RLA characterize issues pertaining to sufficient anti-union animus as jurisdictional in nature. *See, e.g.*, *Int'l Bhd. of Teamsters, AFL-CIO, Teamsters Loc. Union No. 2727 v. United Parcel Serv. Co.*, ("*UPS*") 447 F.3d 491, 502 (6th Cir. 2006) (collecting cases and noting "none of th[ose] courts found such jurisdiction to be appropriate in practice"); *Loc. Union No. 2000, Int'l Bhd. of Teamsters, AFL-CIO v. Nw. Airlines, Inc.*, ("*Northwest Airlines*") 21 F. Supp. 2d 751, 757 (E.D. Mich. 1998), *aff'd*, 182 F.3d 917 (6th Cir. 1999) (finding that the court lacked subject matter jurisdiction over the dispute for lack of sufficient anti-union animus). The Court will assess the facts and arguments presented by the Parties to determine whether the Court has subject matter jurisdiction. *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) ("When facts presented to the district court give rise to a factual controversy, the district court must therefore weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist."). If this Court lacks jurisdiction to hear the Union's claims, the Union has no likelihood of success on the merits, its Motion for a Preliminary Injunction must be denied, and this case will be terminated.

## ANALYSIS

First, the Court **GRANTS** the Union's Motion for Leave to file a Second Amended Complaint and considers the facts alleged therein while ruling on the Union's Preliminary Injunction Motion.  The Preliminary Injunction Motion and related briefing referenced several facts not alleged in the operative Amended Complaint: the August 11, 2023 email from Defendants' Chief Executive Officer, the baseball incident, and Mr. Bobo's individual defamation lawsuit.  Although these facts were not alleged within the First Amended Complaint, the Union discussed the August 11, 2023, email and the baseball incident in its Preliminary Injunction Motion at length, which Defendants had an opportunity to address and chose to do so.  And while Plaintiff did not reference Mr. Bobo's individual lawsuit in its Preliminary Injunction Motion—because it had not yet been filed—the Company addressed the lawsuit in its response in opposition to Plaintiff's Preliminary Injunction Motion, and the Union addressed it in its reply.  Accordingly, little to no prejudice exists if the Court considers these facts when ruling on the Preliminary Injunction Motion, as both Parties have already addressed all of them in their legal arguments.  Therefore, the Court finds the Union has demonstrated good cause and **GRANTS** the Union's Motion for Leave to file its Second Amended Complaint, and considers the facts alleged therein for the purposes of the Union's Preliminary Injunction Motion.

The Union's claims are made pursuant to § 2, Third and Fourth of the RLA.  Section 2, Third of the RLA gives workers the right to choose collective bargaining representatives without interference, influence, or coercion.  45 U.S.C. § 152 (Third).  Section 2, Fourth of the RLA prevents carriers—including airlines—from interfering with the organization workers have chosen to represent them.  45 U.S.C. § 152 (Fourth).  Disputes under the RLA may arise in two contexts: precertification and post-certification.  A precertification dispute involves workers who are attempting to form a union, and a company interferes with those organizing efforts.  A post-

10

certification dispute involves a union that has already been certified to represent workers, and the company is interfering with that union. *See UPS*, 447 F.3d at 501–03.

The United Sates Supreme Court "has observed that § 2, Third and Fourth, as amended in 1934, address 'primarily the precertification rights and freedoms of unorganized employees.'" *UPS*, 447 F.3d at 501 (quoting *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989)). Although the Sixth Circuit has never explicitly held that § 2, Third and Fourth apply in the *post-certification* context, it has recognized that many district Courts and other Circuit Courts of Appeal have done so. *Id.* at 502 (collecting cases). The Sixth Circuit noted that federal-court jurisdiction over those actions is, however, "extremely limited." *Id.* (quoting *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996)). Because circumstances allowing federal-court jurisdiction are "extremely limited," courts have permitted intervention in three sets of circumstances: where carrier conduct (1) reflects anti-union animus; (2) constitutes an act of intimidation that cannot be remedied by administrative means; or (3) constitutes a fundamental attack on the collective bargaining process or a direct attempt to destroy a union. *Id.* If one of these limited circumstances exist, this Court has subject matter jurisdiction.

Circumstances "demonstrat[ing] sharp bargaining practices . . . in an effort to gain [a] competitive advantage," or "competitive jockeying," "notably fail to demonstrate [anti-union] animus or a fundamental attack on the bargaining process." *Air Line Pilots Ass'n Int'l v. Spirit Airlines, Inc.*, No. 08-CV-13785, 2009 WL 1803236, at *16 (E.D. Mich. June 18, 2009) (quoting *Wightman*, 100 F.3d at 234) (internal quotation marks omitted). Other Circuit Courts of Appeal have similarly explained that post-certification claims under § 2, Third and Fourth require "exceptional circumstances" prior to Court intervention. *Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 280 F.3d 901, 906 (9th Cir. 2002); *Bhd. of Ry., Airline & S.S. Clerks,*

*Freight Handlers, Exp. & Station Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 408 (7th Cir. 1988).

The Union's grievances arise in the post-certification context, as the Company's pilots are organized and represented by the Union. Accordingly, the Court's "extremely limited" jurisdiction exists if one of three circumstances are present: (I) the Company's conduct reflects anti-union animus; (II) the Company committed acts of intimidation that cannot be remedied by administrative means; or (III) the Company committed a fundamental attack on the collective bargaining process or made a direct attempt to destroy the Union. *UPS*, 447 F.3d at 502; *see also Spirit Airlines*, 2009 WL 1803236, at *16. Anti-union animus is the primary focus of the Parties' arguments. The Court considers each of these arguments in turn.[2]

## I.        Anti-Union Animus

Because the RLA primarily serves to protect pre-certification rights of workers, "the level of anti-union animus required to justify federal court intervention in post-certification disputes is substantial." *Northwest Airlines*, 21 F. Supp. 2d at 756. For example, indefinitely and selectively suspending all of a union's active-duty leadership without justification while not suspending similarly situated employees for the same or worse conduct demonstrates sufficient anti-union animus to warrant federal court intervention. *BLET v. Union Pacific Railroad*, 31 F.4th 337, 347

---

[2] The Union repeatedly argues that this is a "major dispute" under the RLA and asserts that the Company argues it is a "minor dispute." (Pl. Resp., ECF No. 23, at PageID # 4096–98; Pl. Mot., ECF No. 32-1, at PageID # 4198.) Because the Company has clarified that it is not asserting that the Court lacks jurisdiction because this case involves a "minor dispute" (Def. Reply at 8, ECF No. 26, at PageID # 4133), the Court need not consider whether the allegations at issue constitute a major or minor dispute under the RLA. *See UPS*, 447 F.3d at 502 ("Some lower courts have recognized that even if a dispute arises in the representation, *major or minor dispute setting*, federal courts may theoretically have jurisdiction under § 2, Third and Fourth, if there is evidence of 'carrier conduct reflecting anti-union animus, ... discrimination, or coercion' or when 'a carrier commit[ed] acts of intimidation that c[ould not] be remedied by administrative means, or commit[ed] a fundamental attack on the collective bargaining process or ma[de] a direct attempt to destroy a union.'") (emphasis added) (citations omitted).

(5th Cir. 2022), cert. denied, 143 S.Ct. 564 (2023) ("*BLET*").  However, "the disciplinary investigation of [] three Union representatives . . . even if unjustified," is insufficient to demonstrate the requisite level of anti-union animus for this Court's intervention.  *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers*, 915 F.2d 43, 53 (1st Cir. 1990).

Whether a company's actions amount to sufficient anti-union animus to justify federal court jurisdiction is a fact-specific inquiry.  The Company argues that the three emails sent by Company leadership, the baseball incident, and Mr. Bobo's lawsuit do not amount to sufficient anti-union animus, while the Union argues it does.  Thus, the question before this Court is whether the facts alleged amount to the kind of substantial anti-union animus found in prior post-certification cases to justify jurisdiction.  First, the Court considers the three emails at issue.  Second, the Court considers the baseball incident.  Third, the Court considers Mr. Bobo's defamation lawsuit.

### A.      The Three Emails

The Union primarily relies on two cases to argue that the Company's emails demonstrate anti-union animus sufficient to warrant this Court's intervention.  First, the Union relies on a recent Fifth Circuit Court of Appeals case, *BLET v. Union Pacific Railroad*.  31 F.4th at 347.  The Fifth Circuit held that disciplining pro-union employees who did not participate in a fight, while not disciplining a pro-company employee who actually fought, demonstrated significant anti-union animus justifying federal jurisdiction.  *Id.* at 346–47.  By suspending "effectively all the division's elected representatives," the company interfered with the union in violation of § 2, Third of the RLA.  *Id.*

13

Second, the Union relies on *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 883 (9th Cir. 2002). In *Konop*, a pilot for the defendant Hawaiian Airlines maintained a website that was critical of the airline, its officers, and the incumbent union. *Id.* at 872. Although the website was password-protected, one of Hawaiian's vice presidents obtained a pilot's log-in information, logged into the website, and viewed the plaintiff's postings. *Id.* at 873. The Ninth Circuit held that triable issues of facts existed regarding the plaintiff's claims and reversed the district court's order granting summary judgment in favor of the company. *Id.* at 884–86. The court rejected the company's argument that it did not appreciably limit the worker's organizing activities, stating that "the tendency to chill protected activities, not the actual chilling of protected activities, that renders eavesdropping and surveillance generally objectionable under federal labor law." *Id.* at 884.

The Union argues that *BLET* and *Konop* involve facts similar to the present case, stating that the three emails disparage the Union in an attempt to undermine its leadership. (Pl. Reply, ECF No. 43, at PageID # 4377.) The Union claims that Mr. Bobo's email instructing Pilots to refrain from sharing the Website with Owners included a threat to discipline them, and that despite making the same communications in the past, the Company did seek to quell the Union's speech. (Pl. Mot., ECF No. 32-1, at PageID # 4196, 4202.) It further claims that the CEO's August 11, 2023, email "openly and unlawfully sought to foment internal dissent within the Union over how dues money is spent, disparaged Union leadership and threatened the Union with a retaliatory defamation lawsuit." (*Id.* at PageID # 4197.) Finally, the Union argues that the fact it has other methods of communicating with the public is irrelevant, and that the Company cannot "pick the most effective means the Union has and unlawfully ban it, leaving the Union with other mans like

14

spending resources on advertisements."  (Pl. Mot., ECF No. 32-1, at PageID # 4199; Pl. Reply, ECF No. 43, at PageID # 4376–77.)

The Company offers an entirely different characterization of the emails.  The Company relies on several post-certification cases where courts declined to exercise jurisdiction, arguing that the facts in this case are even less indicative of anti-union animus than in that precedent.

The Company relies on *Northwest* Airlines to demonstrate that, in this Circuit, *some* evidence of anti-union animus is insufficient to warrant federal court intervention in post-certification disputes.  In *Northwest Airlines*, the company authorized union representatives to distribute pro-union leaflets in crew lounges in the airport, then called law enforcement to remove the union representatives for failing to obtain a permit for leafleting.  *Northwest Airlines*, 21 F. Supp. 2d at 756.  On that same day, the company issued letters to the union representatives informing them that their conduct violated the company's Rules of Conduct.  *Id.* at 753–54.  The court found that, while the company did attempt to remove the union representatives with the assistance of law enforcement the day after a grievance was brought to management, the company's actions did not demonstrate anti-union animus "at a level that would vest [the] court with jurisdiction under the RLA in [a] post-certification dispute."  *Id.* at 756.  Moreover, the court found that while the company did interfere with certain communications, it did not make attempts to interfere with other methods by which the union could communicate with its members.  *Id.* at 757.

The Company offers several other post-certification cases to show what conduct does *not* amount to sufficient anti-union animus.  *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers*, 915 F.2d 43, 53 (1st Cir. 1990) (unjustifiably commencing a disciplinary investigation of three union representatives does not constitute anti-union animus

15

warranting federal jurisdiction); *Air Line Pilots Ass'n Int'l v. Spirit Airlines, Inc.*, No. 08-CV-13785, 2009 WL 1803236, at *17 (E.D. Mich. June 18, 2009) (lacking jurisdiction where the company allegedly terminated or modified essential contractual protections for pilots, forced pilots to fly sick and past their effective furlough dates, and repeatedly offered bargaining proposals that would undermine the union and make the union appear unable to adequately represent workers).

The Company argues that these cases show the amount of anti-union required for this Court's intervention is substantial, and the facts alleged by the Union simply do not meet that high bar. The Company disagrees with the Union's characterization of the three emails, arguing that "[m]ildly-worded reminders about existing policies and company statements about the typical course of collective bargaining are hardly the sort of 'exceptional circumstances' necessary to justify judicial intervention in the collective bargaining process under the RLA." (Def. Resp., ECF No. 36, at PageID # 4257.) The Company contends that its emails demonstrate the Company "intends to keep trying to work with [the Union]." (*Id.* at PageID # 4258.) To the extent the emails are critical of the Union, the Company asserts that communicating its views regarding unions during ongoing negotiations is permitted—even if those views are critical. (Def. Mot., ECF No. 18-1, at PageID # 3386); *Air Line Pilots Ass'n Int'l v. Flying Tiger Line, Inc.*, 659 F. Supp. 771, 774 (E.D.N.Y. 1987)). The Company argues that its executives' emails are perfectly lawful because "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *US Airways, Inc. v. Nat'l Mediation Bd.*, 177 F.3d 985, 993 (D.C. Cir. 1999) (quoting *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)).

The Company also argues that it has legitimate business reasons for enforcing its policy against discussion of "personal issues or controversial topics" with Owners.  (Def. Resp., ECF No. 36, at PageID # 4256.)  Mr. Bobo, the COO, declares that he was concerned about the potential impact of discussing the Website with Owners, as the Company's goal is to deliver an experience with minimal "potentially discordant or stressful interactions with the people who are providing the service."  (Bobo Decl., ECF No. 36-1, at PageID # 4273–74.)  The Company further argues that the Union remains free to communicate its message to Owners via multiple other means.  (*Id.* at PageID # 4275.)  The Company's restriction on communications to Owners during flight service was not designed to silence the Union or entirely limit its communication to Owners and the public at large.  (*Id.*)

Considering the evidence presented in the Preliminary Injunction Motion papers and the Parties' arguments, the Court finds the emails do not present sufficient anti-union animus to warrant federal jurisdiction.  The Company's emails, while critical of the Union and demonstrative of clear frustration with the Union's actions, do not amount to the kind of substantial anti-union animus required for this Court to intervene in the post-certification context.  The emails are not disparagement or an attempt to undermine and/or destroy the Union, as the Union alleges, but they are also not so "mildly-worded" as the Company argues—they contain strong critique.

Critique, however, is permitted.  *Flying Tiger* is instructive regarding companies' ability to criticize unions during negotiations.  In *Flying Tiger*, the company, through its Vice President of Human Resources, sent to all pilots a letter criticizing the union.  *Flying Tiger*, 659 F. Supp. at 774.  The letter stated that the Vice President was disappointed in the union's response to the company's "efforts to deal seriously," that the union's negotiator created a "roadblock in the way of restoring a significant portion of income to pilots," and that the negotiator was misleading his

17

constituents. *Id.* at 773. The company went on to say that the negotiator had berated many people during negotiations, the negotiator's comments were vindictive and unproductive, and the company could not understand the negotiator's unwillingness to achieve cost reductions for the pilots. *Id.* at 773–74.

While the court in *Flying Tiger* did not address the pre- and post-certification issues regarding anti-union animus, it was a post-certification case where the court denied the union's request for a preliminary injunction because the company's conduct did not violate the RLA. *Id.* at 775–76. The court clarified that speaking directly to union members regarding collective bargaining issues does not automatically violate § 2, Third and Fourth of the RLA. *Id.* at 774–75 (noting that "the First Amendment allows the employer some scope to bring its views to the attention of its employees"). "[O]nly if the communication is couched in such terms as to give the impression, explicitly or impliedly, of an unwillingness to deal fairly with that representative can the employer be said to be interfering with the employees' statutory right to bargain through its chosen representative." *Id.* at 775.

Like the employer in *Flying Tiger*, the Company has not expressed an unwillingness to deal fairly with the Union. Indeed, the Company has repeatedly expressed a desire to reach a mutually agreeable solution. The emails present a consistent willingness to continue bargaining with the Union. The Company reiterates its desire to negotiate a mutually beneficial agreement with the Union in two of the three emails sent by Company leadership. (Pl. Mot., ECF No. 32-1, at PageID # 4203.) This repeatedly stressed desire to reach an agreement demonstrates that the three emails simply do not amount to "a systematic, predetermined and improper campaign to undermine the Union." *Northwest Airlines*, 21 F. Supp. 2d at 757; *see also Flying Tiger Line*, 659

F. Supp. at 775–76 (denying preliminary injunction where a company's "letter recognizes the existence of the union and its role in the bargaining process").

While the Union objects to the relevance of its ability to communicate with Owners via other means, at least one court in the Sixth Circuit has considered such alternative modes of communication as relevant to determine a company lacked sufficient anti-union animus to warrant federal jurisdiction. *See Northwest Airlines*, 21 F. Supp. 2d at 757. Although the company in *Northwest Airlines* had prevented union members from distributing leaflets in the crew lounge, it had not interfered with other methods of communication. *Id.* Further, the court found it relevant that the company had legitimate business reasons to prevent such communications on its premises. *Id.* These considerations are directly relevant to the case at bar. Here, the Union has been able to communicate with the public—including Owners—regarding the ongoing negotiations. (Bobo Decl., ECF No. 36-1, at PageID # 4275; Ferrell Decl., ECF No. 36-7, at PageID # 4323.) Additionally, the Company has legitimate business reasons for preventing discussions about controversial topics—such as heated labor negotiations—while the pilots are flying the Owners, as it seeks to ensure that all interactions with Owners are positive and create an uncontroversial experience. (Bobo Decl., ECF No. 36-1, at PageID # 4273–74.) The Union's ability to promote its interests through multiple other means is further evidence that the Company has not engaged in anti-union animus that is an improper campaign to undermine the Union.

The Union's supporting precedent is unpersuasive. *Konop* is distinguishable because it is a precertification case that did not examine whether the defendant's actions amounted to anti-union animus. *See generally Konop*, 302 F.3d at 885. *Konop* is further distinguishable because of its facts. There, the company's leadership used false pretenses to access a secure website and disseminate those private communications to a rival union to benefit one union over another

faction. *Konop*, 302 F.3d at 884–86. The facts in the case at bar do involve a website, but unlike the website in *Konop*, the Website is publicly accessible. The Company has not attempted to access the Website by covert means or distribute its contents to the detriment of one union and in favor of another. Rather, the Company has merely instructed its workers not to communicate the Website to Owners during flights. (Pl. Mot., ECF No. 32-1, at PageID # 4181.)

Like *Konop*, *BLET* is distinguishable on its facts. The facts of *BLET* present far greater evidence of anti-union animus than what is present here. The company in *BLET* took affirmative steps to greatly undermine the union, only disciplining union members who did not even engage in a fight. This case does not present issues of differential treatment.

*Northwest Airlines* is more persuasive than *BLET* or *Konop*, and it supports the conclusion that the facts in this case do not amount to sufficient anti-union animus to warrant federal jurisdiction. Baiting crewmembers into leafleting in their crew lounge, only to call law enforcement to eject those same crewmembers demonstrates at least some pretextual anti-union animus. *Northwest Airlines*, 21 F.Supp. 2d at 756–57. Yet, after hearing two days of testimony, the Eastern District of Michigan found that said events did not indicate "anti-union animus at a level that would vest this court with jurisdiction under the RLA in this post-certification dispute." *Id.*

While the Company leadership's rhetoric—particularly the use of terms like "defamatory," "knowingly false," and repeatedly suggesting that the Union is a distraction to the Union's members—is understandably objectionable to the Union, these statements alone simply do not amount to the kind of anti-union animus that courts have found as violations in post-certification RLA cases. This is not a case where the Company has used covert means to access the Union's website (*Konop*), nor is this a case where the Company is exercising differential treatment of pro-

Union and pro-Company employees (*BLET*).  Indeed, these facts present less animus than the pretextual calling of law enforcement in *Northwest Airlines*, where the court found it lacked jurisdiction.  Similarly, these emails do not demonstrate sufficient anti-union animus to create federal jurisdiction.

### B.    The Baseball Incident

The Union argues that the baseball incident is an additional basis for finding sufficient anti-union animus.  The Union contends that the baseball incident presents a *per se* violation of the RLA and represents overwhelming evidence of anti-union hostility which cannot be remedied except by an injunction.  (Pl. Mot., ECF No. 32-1, at PageID # 4197.)  The Union does not cite to precedent to support this argument.

The Company argues that the baseball incident does not support the Union's case because Mr. Bobo was not involved.  (Def. Resp., ECF No. 36, at PageID # 4259.)  The Company stresses that Mr. Bobo was not wearing the clothes described by the eyewitness, the camera footage of the Company's premises and Mr. Wittke's home security shows that Mr. Bobo was not in the vicinity of the mobile billboard truck at any time during the alleged incident.  (*Id.*)  Thus, the Company disagrees with the facts alleged surrounding the baseball incident.

The baseball incident does not support invoking this Court's extremely limited federal jurisdiction.  The facts surrounding the baseball incident are contested.  The Union attributes the baseball throw to Mr. Bobo, while the Company offers evidence that Mr. Bobo had an alibi.  The Court is persuaded by the multiple declarations and extensive camera footage showing where Mr. Bobo was during the incident, such that it was highly unlikely Mr. Bobo was the person who threw a baseball at the mobile billboard truck.  While the mobile billboard truck driver claims to be "100

percent certain" that Mr. Bobo was the person who threw the baseball, camera footage demonstrates that he could not have been at the scene of the incident when the baseball was thrown.

### C. Mr. Bobo's Defamation Lawsuit

The Union also argues that Mr. Bobo's defamation lawsuit is baseless and an "unlawful Strategic Lawsuit Against Public Participation ("SLAPP")" that demonstrates significant anti-union animus. (Pl. Reply, ECF No. 43, at PageID # 4373.) The Union relies on cases involving the National Labor Relation Act (NLRA). Citing *Bill Johnson's Restaurants, Inc. v. NLRB*, the Union argues that it is unlawful for an employer "to prosecute an unmeritorious lawsuit for a retaliatory purpose," but "the offense is not enjoinable unless the suit lacks a reasonable basis." 461 U.S. 731, 749 (1983). Further, the Supreme court clarified that a lawsuit prosecuted against a union violates the NLRA only when it is both objectively and subjectively baseless, meaning that no reasonable litigant could expect to succeed on the merits of his claims, and that it was intended to retaliate against the Union. *Id.* at 525–26.

The Union claims that Mr. Bobo's defamation lawsuit is baseless on its face. The Union argues that the lawsuit is baseless because it published the statements after determining the driver's identification of Mr. Bobo was credible and asserts that Mr. Bobo's complaint contains false allegations lacking evidentiary support regarding what the Union published to its members. (Pl. Reply, ECF No. 43, at PageID # 4378, 4381–82.) Finally, the Union argues that the Company and Mr. Bobo are coordinating the defamation lawsuit, noting that the Company's general counsel used to be a partner at the firm now representing Mr. Bobo in his defamation lawsuit. (Pl. Reply, ECF No. 43, at PageID # 4377.) Accordingly, the Union argues that Mr. Bobo's lawsuit demonstrates anti-union animus.

The Company argues that Mr. Bobo's defamation lawsuit against the Union does not

amount to an independent violation of the RLA.  (*Id.* at PageID # 4260.)  The Company argues that Mr. Bobo is exercising his "right to seek local judicial protection from tortious conduct during a labor dispute." *Bill Johnson's Rests., Inc. v. Nat'l Lab. Rels. Bd.*, 461 U.S. 731, 742 (1983).  In *Bill Johnson's Rests.*, the Supreme Court held that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [NLRA]." *Id.* at 743.  A frivolous lawsuit, however, is not protected conduct.  To be considered frivolous, the lawsuit must lack a reasonable basis.  *Id.* (explaining that lawsuits lacking a reasonable basis "are not within the scope of First Amendment protection")

In the NLRA context, in order to determine whether a lawsuit is frivolous and commenced in violation of federal labor law, the lawsuit must have both a "retaliatory motive and lack of reasonable basis." *Id.* at 748–49.[3]  The Company argues that the distance in time between the filing of the present case and the filing of Mr. Bobo's lawsuit demonstrates that the lawsuit was not made in retaliation to the Union or in an attempt to alter the ongoing collective bargaining efforts.  (Def. Resp., ECF No. 36, at PageID # 4261.)  Because Mr. Bobo is a plaintiff in state court, he is entitled to have the factual issues resolved in state court.  (*Id.*)  Finally, the Company clarifies that Mr. Bobo's lawsuit is *his*, not the Company's, and his actions cannot be imputed to the Company.  (*Id.*)

Mr. Bobo's individual defamation lawsuit in the Delaware County Court of Common Pleas

---

[3] The Company cautions against using NLRA principles in the RLA context, noting that courts "should be especially circumspect to engraft NLRA precedent into the railway labor context where, as here, the statutory language of the RLA differs substantially from section 7 of the NLRA." *Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 250–51 (5th Cir. 1991).  In that vein, the Company criticizes the Union's reliance upon *Konop* specifically because it relies on NLRA cases in an RLA case.  (Def. Resp., ECF No. 36, at PageID # 4261.)

does not support finding anti-union animus sufficient to warrant federal jurisdiction. Absent post-certification cases involving facts with a defamation lawsuit, the Court will consider NLRA precedent. *See Konop*, 302 F.3d at 882, fn. 10 ("While employers covered under the RLA are not subject to the provisions of the NLRA, courts look to the NLRA and the cases interpreting it for guidance.") (citing *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383 (1969)). In *Bill Johnson's*, the Supreme Court held that the NLRB "may not enjoin reasonably based state court lawsuits in part because of First Amendment concerns." *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 530 (2002) (citing *Bill Johnson's*, 461 U.S. at 742–43). The Supreme Court clarified that its holding "limited regulation to suits that were both objectively baseless and subjectively motivated by an unlawful purpose." *Id.* at 531. Crucially, the Supreme Court held that the NLRB must act in a manner to "preserve the state plaintiff's right to have a state court jury or judge resolve genuine material factual or state-law legal disputes pertaining to the lawsuit." *Bill Johnson's Rests.*, 461 U.S. at 749. Accordingly, the Court is wary to examine Mr. Bobo's defamation lawsuit for a reasonable basis without passing judgment on the merits of it. Both the Union and the Company agree that filing a frivolous defamation lawsuit violates federal labor law. The Parties disagree about whether Mr. Bobo's lawsuit is baseless.

Having considered the allegedly defamatory statements and the moving papers, Mr. Bobo's lawsuit is not facially baseless. The timing of Mr. Bobo's lawsuit suggests it is not filed in retaliation to the Union's collective bargaining efforts. This lawsuit was filed over six months before Mr. Bobo filed his defamation lawsuit. Mr. Bobo filed his defamation lawsuit less than two weeks after the Union's statements regarding the baseball incident. Even if Mr. Bobo is unable to succeed in demonstrating actual malice on the part of the Union, it would be inappropriate for this Court to intervene in his state court action at this juncture. *BE & K Const. Co.*, 536 U.S. at 532

24

("[E]ven unsuccessful but reasonably based suits advance some First Amendment interests.").

The Court notes that it is important to distinguish the allegedly defamatory publications to Union members from the Union's Motion for a Preliminary Injunction.  Mr. Bobo's complaint alleges that the messages to Union members are the defamatory statements, while the Union repeatedly refers to its declarations attached to its Motion for a Preliminary Injunction.  (Compare Mr. Bobo's Compl., ECF No. 36-5, *with* Pl. Reply, ECF No. 43, at PageID # 4381–82.)  Nothing in the police reports or in eyewitness testimony states that someone emerged from Mr. Bobo's residence—merely that the incident occurred near there.  (*See* ONeal Decl., ECF No. 32-2.)  Thus, it appears from the evidence presented, that at least the statement that someone emerged from Mr. Bobo's residence may have been incorrect.  The remaining factual issues, including the "actual malice" question depending on what the Union knew and when, are more fit for resolution in the Delaware County Court of Common Pleas.  *See Bill Johnson's Rests.*, 461 U.S. at 748.  This Court will refrain from injecting itself into an ongoing state court dispute.

Finally, the Court will not attribute Mr. Bobo's individual defamation action to the part of the Company.  While the Company's general counsel may have been a partner at the firm now representing Mr. Bobo in his defamation lawsuit (Pl. Reply, ECF No. 43, at PageID # 4377), this is insufficient evidence to conclude that the Company is working in concert with Mr. Bobo's attorneys in actually prosecuting the defamation action.

Altogether, the Company's three emails limiting the Union's communications with Owners during service and critiquing the Union, the baseball incident, and Mr. Bobo's lawsuit do not demonstrate sufficient anti-union animus to warrant this Court's jurisdiction.

## II.     Acts of Intimidation that Cannot be Remedied by Administrative Means

The second set of circumstances where federal Court jurisdiction over post-certification disputes exist where a company commits acts of intimidation that cannot be remedied by

administrative means.  *UPS*, 447 F.3d at 502.  The Company has argued that the Union has not alleged any acts of intimidation that cannot be remedied by administrative means because the underlying issue is the Company's alleged threatened discipline of employees for promoting the Union's Website, and the Collective Bargaining Agreement specifically contemplates employee grievance and arbitration procedures.  (Collective Bargaining Agreement ("CBA"), ECF No. 18-3, at PageID # 3626–29, 3635–40; Def. Mot., ECF No. 18-1, at PageID # 3388–99.)  The Union did not raise any arguments to the contrary in its Response in Opposition to the Company's Motion, merely raising arguments regarding anti-union animus and a fundamental attack on the Union. (*See* Pl. Resp. at 14–20, ECF No. 23, at PageID # 4099–105.)  The Union has similarly omitted any arguments under this prong in its Motion for Preliminary Injunction.  (*See* Pl. Mot., ECF No. 32-1.)

Because any discipline of the pilots for violating their Crewmember Policy Manual would be subject to arbitration under the Collective Bargaining Agreement—an argument which the Union does not address—the Company's conduct does not amount to an act of intimidation that cannot be remedied by administrative means.

Thus, jurisdiction is not warranted on this basis.

## III.    Fundamental Attack or Attempt to Destroy the Union

The final basis for invoking this Court's jurisdiction over a post-certification RLA dispute is where a company fundamentally attacks or attempts to destroy a union.  The Union categorizes "certain prohibitions on . . . leafleting in a crew lounge" as a "mundane affront[] to the union." (Pl. Resp. at 19, ECF No. 23, at PageID # 4104.)  The Union's reference to prohibitions on leafleting in crew lounges is likely a reference to *Northwest Airlines*, where the Eastern District of Michigan held that the company's restrictions did not amount to a fundamental attack on the union.

26

*Northwest Airlines*, 21 F. Supp. 2d at 757.

The Union characterizes the Company's conduct as stripping pilots of "the right to engage in fundamental, protected labor speech in support of their certified collective bargaining representative." (Pl. Mot., ECF No. 32-1, at PageID # 4205–06.) However, the Union does not identify any similar case where a court found a company's acts to constitute a "fundamental blow" sufficient to warrant judicial intervention in the post-certification context. Indeed, the Union's allegations actually demonstrate far less of an attempt to destroy or fundamentally attack the Union than that in *Northwest Airlines*, where the court found it did not have jurisdiction. In *Northwest Airlines*, the company called the sheriff's department to remove union representatives from crew lounge areas, despite authorizing the union representatives' actions in the first place. *Nw. Airlines*, 21 F.Supp.2d at 756.

Here, the facts as alleged demonstrate that the Company remains willing to negotiate an agreement with the Union and has not attempted to fundamentally attack the collective bargaining process. In both the April 19 and August 11 emails, Company leadership reiterated a desire to reach an interim agreement with the Union. (Pl. Mot., ECF No. 32-1, at PageID # 4183–87.) The Company has not called law enforcement on the Union to "destroy" it or attempted to undermine its leadership in a fundamental attack on the bargaining process. *See UPS*, 447 F.3d at 502; *Northwest Airlines*, 21 F.Supp. 2d at 757. For the reasons already stated, the Court is hesitant to attribute Mr. Bobo's lawsuit to the Company, and it does not lack a reasonable basis on its face.

Accordingly, the Court does not have jurisdiction under the "fundamental attack" prong of post-certification RLA disputes.

## CONCLUSION

For the reasons stated herein, the Court **GRANTS** the Union's Motion for Leave to File

Second Amended Complaint (ECF No. 44.)  Having considered the Parties' briefing, the Court determines it lacks subject matter jurisdiction to reach the merits of the Union's case.  The Company's actions do not present sufficient anti-union animus to warrant jurisdiction.  Nor has the Company committed acts of intimidation that cannot be remedied by administrative means. Finally, the Company has not struck a fundamental blow to the Union.

The Court, having determined that it lacks subject matter jurisdiction, **DENIES** the Union's Motion for Preliminary Injunction (ECF No. 32).  All other pending motions (ECF Nos. 18, 24) are **DENIED** as moot.  The Court **DISMISSES** the Union's Second Amended Complaint without prejudice.

The Clerk is hereby **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED.**


<u>1/5/2024</u>                                    <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                            **EDMUND A. SARGUS, JR.**
                                                    **UNITED STATES DISTRICT JUDGE**